IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

DEVIN ALEX PHILLIP PENDLETON                                    PLAINTIFF

v.                              No. 2:10-cv-02026

APN JEAN FINLEY                                                DEFENDANT

## MEMORANDUM OPINION

Plaintiff, Devin Alex Phillip Pendleton ( "Pendleton"), who is presently incarcerated in the Arkansas Department of Correction, Cummins Unit in Grady, Arkansas, filed this action pursuant to 42 U.S.C. § 1983 on February 22, 2010, alleging the defendants violated his constitutional right to adequate medical care while he was incarcerated at the Crawford County Detention Center ("CCDC"). ECF No. 1. Pendleton was arrested and booked into the CCDC on October 10, 2009, and was incarcerated there until early September 2010. ECF. No. 71, Pl. Ex. 7. On March 13, 2012, summary judgment was entered in favor of three named defendants - Sheriff Mike Allen, Sergeant Lacy Ree[1], and Crawford County, Arkansas - leaving Advance Practitioner Nurse, Jean Finley ("APN Finley"), as the sole named defendant. ECF No. 37.

Pendleton alleges APN Finley was deliberately indifferent to his serious illness or injury in violation of the Eighth Amendment. ECF No. 11. Pendleton proceeds *pro se* and *in forma pauperis*. ECF Nos. 3, 60. This case is before the undersigned for decision pursuant to the consent of the parties. ECF No. 49. APN Finley filed a motion for summary judgement on May 4, 2012. ECF Nos. 50-52. The undersigned denied APN Finley's motion on June 11, 2012. ECF Nos. 69-71, 73. On June 26, 2012, a bench trial was held before the undersigned. ECF No. 79. At the conclusion

---

[1] Sergeant Lacy Ree was incorrectly named as "Sergeant Rea" on the Complaint. ECF No. 1.

of the trial, the case was taken under advisement pending preparation of this memorandum opinion.

## I.        Summary of the Claims:

Upon booking, Pendleton was placed on suicide watch.  ECF No. 50, Def. Ex. 1 at 3.  On October 16, 2009, Pendleton was seen by APN Finley[2]  with complaints of depression, anxiety, and upset stomach.  ECF No. 71, Pl. Ex. 7.  APN Finley noted Pendleton had attempted suicide in the past and assessed him as being anxious and depressed.  ECF No. 50, Def. Exs. 1, 4.  She also noted Pendleton had high blood pressure and prescribed 20mg Lisinopril, a medication Pendleton had informed he was taking before incarceration.  ECF No. 50, Def. Ex. 1.  With respect to his upset stomach, she advised Pendleton to take Pepto-Bismal.  ECF No. 71, Pl. Ex. 7.  However, Pendleton did not obtain any Pepto-Bismal as he contended without a prescription from APN Finley, he is unable to receive even over-the-counter medication[3].  *Id.*  After consulting with Dr. Edwards, APN Finley prescribed 150mg of SeroquelXR[4], to be given once daily to treat his depression and anxiety. ECF No. 50, Def. Ex. 1.  APN Finley testified she was aware of the possible side-effects of mixing Lisinopril and SeroquelXR when she prescribed them, but that she believed the choice of medications and dosage were appropriate for Pendleton.  ECF Nos. 50, Def. Exs. 1,79.  Likewise, Dr. Edwards testified he consulted with APN Finley regarding Pendleton's medications and felt SeroquelXR was the best option for Pendleton given his age and health.  *Id.*

---

[2] APN Finley was at the relevant time, and now is under contract with the CCDC to provide nursing services to inmates of the CCDC.  ECF No. 50, Ex. 1.  Her collaborative physician is Henry N. Edwards, M.D., a board certified internist.  ECF No. 50, Ex. 1.

[3] APN Finley testified at the bench trial, as did Sergeant Lacy Ree, that jail policy does not require a prescription for over-the-counter medication.  ECF No. 79.

[4] SeroquelXR is recognized as having the potential of inducing hypotension and/or enhancing the effects of certain antiphyertensive agents.  *Physician's Desk Reference*, 65th ed. 2011 at 756.

-2-

On November 9, 2009, Pendleton fainted and fell off of his bunk, injuring his head and ankle. ECF No. 71, Pl. Ex. 7. Pendleton completed a request for medical treatment ("RFMT") form, indicating he was suffering adverse side effects from the medications prescribed to him. ECF No. 71, Pl. Ex. 4. He indicated his depression was worse, his sleep pattern was disturbed, and the SeroquelXR seemed to be causing more panic attacks as well as fainting and dizzy spells. *Id.* He also indicated on the form that he had fallen and believed he fractured his foot or ankle. *Id.* On November 13, 2009, APN Finley examined Pendleton. ECF No. 50, Def. Ex. 1. At exam, Pendleton informed APN Finley that the medication was not helping with his depression or panic attacks. *Id.* APN Finley testified that Pendleton never informed her of his November 9th fall; she indicated she "skimmed" Pendleton's RFMT, but, her standard practice is to rely on what the inmate verbally indicates as his primary complaint in treating despite the information on the RFMT. ECF Nos. 71, Def. Ex. 10, 79. Pendleton testified he told APN Finley about the fall and that he believed he was suffering an adverse reaction to the SeroquelXR, and despite this, she failed to inquire about the fainting spells and did not offer any treatment for his foot or ankle. ECF Nos. 71, Pl. Ex. 7, 79.

Pendleton continued taking SeroquelXR until November 28th, when he collapsed at breakfast call. ECF No. 71, Pl. Ex. 7. Shortly after collapsing, Pendleton was taken to the emergency room at Summit Medical Center in Van Buren, and was diagnosed with vasovagal syncope and possible sick sinus syndrome. ECF No. 71, Pl. Ex. 9. A cardiac consult was ordered and Pendleton was noted to have syncope, most likely vasovagal or related to orthostatic hypotension. *Id.* The episode was believed to be possibly related to an interaction between Lisinopril and SeroquelXR. *Id.* Both medications were discontinued and Pendleton's blood pressure was monitored. *Id.*

II.   **Evidence Presented**:

An evidentiary hearing was held before the undersigned on June 26, 2012.  ECF No. 79.

At the hearing, the testimony of the following witnesses was heard: (1) Pendleton, the Plaintiff; (2)

Dr. Henry N. Edwards, collaborative physician to APN Finley; (3) Jason Goss, Pendleton's cell mate

at CCDC; (4) Retired Deputy Ruben Cole, Crawford County Sheriff's Office; (5) Corporal B. Trent,

Crawford County Sheriff's Office; (6) Sergeant Lacy Ree, Crawford County Sheriff's Office; and

(7) APN Finley, the named Defendant.  For purposes of discussion, the testimony of the witnesses

will be summarized.

### 1. Devin Pendleton

Pendleton testified prior to incarceration he had a documented history of mental illness,

including previous suicide attempts.  In June 2009, Pendleton was treated at Vista Health for a

suicide attempt.  *See* Def. Ex. 1 at 3-17.  During treatment, Pendleton stated he was prescribed

Lexapro, Trazadone (50mg) and Ambien.  He further testified the Lexapro was "not working" in

treating his depression.

Pendleton testified he saw APN Finley on three occasions: (1) 10/16/09; (2) 11/13/09; and

(3) 12/04/09.  Jail procedure required an inmate to complete an RFMT form prior to APN Finley's

arrival each Friday; these forms were collected by the jail staff and given to APN Finley prior to her

seeing the inmate.  *See* Pl. Ex. 4.

On October 16, 2009, Pendleton was seen by APN Finley, and she noted his chief complaints

were "suicidal-depressed" and also noted he complained of anxiety and upset stomach. Pl. Ex. 1.

Pendleton testified that he does not recall the specifics of the visit as it was three days after a suicide

attempt, but he does remember the meeting was "relatively short" being "under ten minutes."  The

treatment plan indicated she considered Celexa and Abilify to treat Pendleton's depression, but SeroquelXR was selected instead, and Pendleton begin receiving 150mg dispensed in the evening. *Id*.  Pendleton testified he informed APN Finley he was prescribed Lisinopril to treat his high blood pressure prior to incarceration and he had never taken SeroquelXR.  She noted this and prescribed 20mg of Lisinopril to be administered daily in addition to the 150mg of SeroquelXR.  Regarding the upset stomach, Pendleton testified APN Finley prescribed Pepto-Bismal, but jail policy required a written prescription - which he testified he did not receive.  Pendleton was taken off suicide watch on October 20, 2009, in response to the SeroquelXR treatment.

On November 9, 2009, Pendleton "began to feel dizzy and then blacked out" in his cell while climbing the ladder to reach his upper bunk.  Pl.'s  Ex. 20 at 1.  He testified that he has little memory from this event, but that upon regaining consciousness he was "disoriented" and felt pain in his head and ankle and believed he fractured his foot or ankle.  His cell mate, Jason Goss, sat Pendleton on the lower bunk while he regained consciousness.

Pendleton testified he saw APN Finley on November 13, 2009, for treatment of his "depression, lack of sleeping, panic attacks, and medication not helping."  Pl. Ex. 3.  Pendleton testified he verbally informed APN Finley of his November 9th "fainting and dizzy" incident and he "advised her that he was having adverse reactions to the SeroquelXR."  The RFMT form contained this information as well, but Pendleton testified APN Finley did not address his foot/ankle injury nor ask him to relate the details from the November 9th incident.  He stated he did not recall APN Finley informing him she was considering changing his medication to Abilify, even after he requested a psychiatric evaluation; he further testified she did not offer to reduce or omit the SeroquelXR treatment in the interim.  From November 9th to November 28th, Pendleton testified he did not have

-5-

any falls and did not faint, but that he did have "dizzy spells and depression."

On November 28, 2009, while waiting in the breakfast line, Pendleton testified he began to feel dizzy and lightheaded and then "passed out." *See* Pl. Ex. 20 at 2. Upon regaining consciousness, Pendleton testified he felt "extreme" pain above the left eye, and when he reached up to touch it, he discovered he was bleeding. He testified Jason Goss and other inmates helped him up from the floor. Pendleton said he could not remember much from the event, but does remember Corporal Trent transported him to Summit Medical Center emergency room for treatment. He was held overnight for observation. On November 29, 2009, Pendleton was seen by Stephen Carney, M.D. and Jose Alemparte, M.D. and was diagnosed with vasovagal syncope and possible sick sinus syndrome. *See* ECF No. 71, Pl. Ex. 9. Dr. Alemparte specifically attributed the syncope to vasovagal or orthostatic hypotension, which was caused by the interaction between Lisinopril and SeroquelXR. *Id*. As such, Dr. Alemparte discontinued SeroquelXR immediately. *Id*. at 2. Neither Dr. Alemparte nor Dr. Carney stopped the Lisinopril to control Pendleton's hypertension, but Pendleton testified he refused to take the medication after this incident. Pendleton was released on November 29, 2009, and Corporal Trent escorted him back to CCDC.

On December 4, 2009, Pendleton was treated by APN Finley for the hospital follow-up. Def. Ex 2 at 4. Pendleton testified APN Finley advised him that he could ask for another provider to treat him, but he did not believe he had the "option for a second opinion" as he was an inmate and relied on her treatment and the complaints he made to her for treatment. Regarding the psychiatric evaluation, Pendleton testified he did not receive one.

Pendleton testified he no longer requires any prescription medication as he now engages in a vegetarian diet and runs daily for exercise, resulting in lost weight and normal blood pressure.

Pendleton also stated since the medications were stopped in 2009, he has not suffered from dizziness or any fainting incidents.

### 2. Henry N. Edwards, M.D.

Henry N. Edwards, M.D. is the collaborative physician to APN Finley; he is also the Chief of Medicine at Summit Medical Center and the Medical Director of Crawford Healthcare and Rehabilitation. *See* Def. Ex. 13. He is a board-certified internist in private practice in Van Buren, Arkansas. APN Finley has been employed by Dr. Edwards since November 2007. Dr. Edwards testified that APN Finley is under contract with the CCDC, and his role, since 2007, is to provide supervision to her. He testified that the collaborations usually took place in the "hallway at [his] office."

Dr. Edwards testified APN Finley has the authority to write prescriptions under the direction of any board certified medical doctor. He also testified that APN Finley keeps a working set of notes for the inmate-patients on which she makes updates to be reflected in the prisoner files when she returns to the jail on Fridays. Dr. Edwards testified SeroquelXR was the preferred medication for Pendleton because of its ability to work as an anti-depressant and sleep aid. The medication can range from 25-400mg per dose, and Dr. Edwards testified based on Pendleton's age and size that 150mg is the standard dose. Dr. Edwards testified that he was aware of the interaction noted between Lisinopril and SeroquelXR, but his opinion was the medication and dosage were "entirely appropriate" for someone of Pendleton's age, specifically stating Lisinopril does not "contraindicate the usage of low dose SeroquelXR."

Dr. Edwards testified that he was not "100% sure" if he was advised that Pendleton was on Lisinopril when he collaborated with APN Finley on the October 16th visit prior to her prescribing

-7-

SeroquelXR.  Likewise, Dr. Edwards also could not recall if he was consulted on the November 13th visit.  However, Dr. Edwards testified that Dr. Alemparte's decision to stop the SeroquelXR after Pendleton's second fainting incident was "reasonable," and he also testified it would have been reasonable after the first  incident to reduce either the Lisinopril or the SeroquelXR.  Finally, he testified that APN Finley's actions were reasonable.

### 3. Jason Goss

Jason Goss ("Goss") testified that he was Pendleton's  cell mate at CCDC from October 2009 through September 2010.  Pl. Ex. 19.  Goss testified he spent four years in the Navy, and during this time learned first-aid.

Goss testified he saw Pendleton faint twice - (1) 11/9/09 in their shared cell; and (2) 11/28/09 when he was behind Pendleton at breakfast call.  He testified he did not see any other fainting or dizzy spells before, between or after each incident.  At the November 9th incident, Goss testified he saw Pendleton sway on the ladder, collapse and hit his foot/knee on the toilet and his head on the floor, after which Pendleton was not responsive.  Based on his own experiences, Goss testified he thought each incident was real, not faked, and qualified as a "serious medical incident."  He further testified he saw Pendleton take the medications as given.

### 4. Retired Deputy Ruben Cole

Retired Deputy Ruben Cole ("Dep. Cole") testified he was employed by the CCDC during the time Pendleton's two incidents occurred.  Dep. Cole testified he did not have any recall from the 11/09 incident as it took place in Pendleton's cell, and that his memory of the 11/28 incident was limited.  Regarding the November 28th incident, Dep. Cole testified he did not see Pendleton fall, but that he remembered walking into the cell after Pendleton had been removed by the other inmates and

radioed the front desk to notify them of the incident.  Dep. Cole testified he may have asked Pendleton his name, but that after calling the  Sergeant the front desk per protocol, he went back to the kitchen to complete the inmate breakfast.  Dep. Cole did not recall if Pendleton was bleeding or hurt.

### 5. Sergeant Brandon Trent

Sergeant Brandon Trent ("Sgt. Trent") testified he was an employee of CCDC during the time of Pendleton's two incidents and further testified he escorted Pendleton to and from Summit Medical Center after the 11/28/09 fall.  Sgt. Trent testified he did not remember the specifics of the discussion in the emergency room, as he takes an average of fifteen to twenty inmates to the hospital each month.  After reviewing his notes, he stated there was nothing out of the ordinary, evidenced by the lack of an incident report.

### 6. Sergeant Lacy Ree

Sergeant Lacy Ree ("Sgt. Ree") testified she was employed by CCDC during Pendleton's two incidents.  Sgt. Ree testified she is one of the officers who is present and sits in on the inmate "medical call" with APN Finley.  Sgt. Ree testified she was present during each of Pendleton's three visits with APN Finley.  Sgt. Ree  could not recall the events that transpired during Pendleton's three visits with APN Finley, but she testified she takes notes of what was said and relied on those to refresh her memory.  Def. Ex. 7.   "I take notes as best I can, no short-hand, for my benefit, so that I can go back and put the notes into the computer and know what was done that day," Sgt. Ree clarified at the hearing.

On October 16th, Sgt. Ree noted Pendleton "need[s] mental health consult" as he has a history of depression, suicide attempts, hears voices, and "sees the little girl" when he closes his eyes." *Id*.

-9-

Sgt. Ree also noted the apparent discussion on the use of Abilify, SeroquelXR, Pepto-Bismal "for stomach," and Lisinopril. *Id*. Sgt. Ree testified Pepto-Bismal does not require a prescription to obtain, that if the inmate is not indigent, he can purchase those items in the commissary.

On November 13th, Sgt. Ree noted Pendleton was seen for panic attacks. She starred the note "need evaluation" and testified this was a psychiatric evaluation, and the notation "nothing done" indicated no psychiatric evaluation was given. *Id*. Sgt. Ree did not note any verbal complaints from Pendleton regarding his alleged dizziness, fainting or falling. Sgt. Ree testified that the lack of notes on the visit is not out of the ordinary. *Id*.

On December 4th, Sgt. Ree made more notes than for other visits, and testified this indicated there was a problem transpiring, but stated that she does not remember the conversation. Sgt. Ree noted Pendleton complained to APN Finley he was having issues "blacking out - she looked in [the] file and did see [that] she had written where he was dizzy and still having anxiety attacks." *Id*. Upon question, Sgt. Ree testified she did not know where APN Finley would have looked regarding the reference "in the file" as that notation was absent in her November 13th notes, but stated "these are my notes, and this is what was said." She clarified to the court that if an inmate had stated in her presence that he was dizzy or had passed out, this information would be reflected in her notes. On re-direct, Sgt. Ree explained that it is possible that Pendleton actually said it and that she did not hear the conversation. However, Sgt. Ree explained the med calls take place in a small room ("10x10 or 12x12"), and she was no more than three feet away at all times. Sgt. Ree also noted APN Finley had no indication in her notes that Pendleton had informed her that he was dizzy. Sgt. Ree testified that APN Finley informed Pendleton of his need to restart Lisinopril, noting his high blood pressure would continue to be an issue. When asked by the court, Sgt. Ree testified her notation regarding

"staple removal" was beyond her recall but that it was likely related to his hospital visit; she specifically informed the court she does not have recollection of Pendleton's visits but rather had to rely on her notes.  When asked about the med call process, Sgt. Ree testified that the procedure is: (1) the inmate completes a RFMT form, and the form is placed in a box in the front office; (2) when APN Finley arrives, she is given a blank nurse's assessment and blank prescription sheet with the RFMT underneath; (3) APN Finley "skims" the RFMT but she mainly relies on what the inmate tells her is at issue because the RFMT may be illegible and/or the complaint may have changed from the time the inmate initially completed the RFMT.

### 7. APN Finley

APN Finley testified that at the time of incident in 2009 she was under contract with the CCDC to treat inmate-patients.  She stated she remained under contract with them through the date of the hearing.  APN Finley testified she did not recall the 10/16, 11/13, or 12/4 visits with Pendleton, but  that she relied on her "working copy" of the notes from those visits.  While the jail maintains its own records of the visit, APN Finley explained she also maintains her own records so she can document collaborations with Dr. Edwards and then reflect those notes on the jail's copy when she returns the next week.  *See* Pl. Ex. 1 and 2; Def. Ex. 6.  APN Finley clarified she quickly reviews the RFMT completed by each inmate but testified she relied on what the inmate told her in person for treatment purposes.  Regarding the med call process, APN Finley testified: (1) she arrives at the jail every Friday to see inmate-patients - the jail pulls the inmate-patients manila folder and she sees anywhere from one to eight inmates; (2) she is given a chart from the officers at the jail with the RFMT and a blank nurse's assessment form; and (3) she sees the prisoners, individually, in the library while a sergeant remains in the room, "[writing] down the words the patient tells [her]."

-11-

When asked if she recalled the October 16th visit, APN Finley testified she did not.  Upon questioning, APN Finley stated she read Pendleton's RFMT form and the prescription of Pepto-Bismal for "upset stomach" was proper.  When directly asked if she read Pendleton's RFMT that mentioned "puking blood," APN Finley acknowledged she had read it but later testified that the absence of "puking blood" in her notes indicated Pendleton did not verbally inform her.  Further, APN Finley testified Pepto-Bismal is an over-the-counter medication that does not require a prescription, but she does not know the jail's policy regarding over-the-counter medications.

Regarding the November 13th visit, APN Finley clarified she does not always see the RFMT prior to treatment, that she sometimes sees it after she consults with inmate-patients, but she has "always read it."  When asked if she disputed that Pendleton verbally told her of his November 9th fainting spell, she stated she only writes down what the patient tells her; therefore, the absence of that note indicated Pendleton did not inform her verbally.  APN Finley explained that while the information was on the RFMT, she might have skipped over that when she skimmed the RFMT.  She further testified she was only made aware of the fainting incident after reviewing the 11/28 hospital file prior to Pendleton's 12/4 visit with her.  She testified if she had been made aware of the fainting, she would have been alarmed.  As to Pendleton's medication interaction, APN Finley also testified that at the time of prescription, she was aware of the interaction between SeroquelXR and Lisinopril.  However, she stated that SeroquelXR was "such a wonderful medicine" for treating depression and anxiety that one pill was preferred to many.  After the 11/13 visit, APN Finley further testified that she felt psychiatric care was needed to determine the proper course of medication and treatment.  She asserted she wanted Pendleton to get the "best care" possible, even going so far as to offer to call Dr. Don Chambers in Van Buren.  APN Finley testified she was informed by Captain Jeff Marvin, Jail

Administrator, that this was not allowed as the jail is responsible for making the arrangements after discussing the situation with the District Attorney.  She testified there was no way for her to know that the jail did not order the psychiatric evaluation she requested.

When asked about reducing SeroquelXR and/or changing Pendleton to Abilify, APN Finley testified she relied on the psychiatric evaluation ordered to determine the proper medications to treat Pendleton's suicidal/homicidal tendencies and depression; she testified she considered changing him to Abilify, but that this was not the appropriate course of action since she referred him to a psychiatrist.  APN Finley testified the product information packet insert indicated SeroquelXR cannot be discontinued abruptly.  When asked about the difference in Drs. Alemparte and Carney stopping the medication at the hospital in contrast to her assertion the medication cannot be abruptly stopped, APN Finley testified she cannot answer the question as she did not make the decision to stop SeroquelXR abruptly.  Aside from ordering the psychiatric evaluation, APN Finley explained if she had been aware of the dizziness and fainting, she could have consulted with Dr. Edwards about reducing the medication, but she clarified she would need a full consult with the patient to make this determination prior to reducing the medication.  APN Finley stated it is always possible to reduce medication.

Regarding Pendleton's allegation that his foot was not given proper care, APN Finley testified she does not remember what the exam of Pendleton's foot consisted of, but there were no further diagnostics ordered.  She acknowledged to properly diagnose a hairline fracture, an x-ray or further diagnostics would be required.  APN Finley explained she has a clear line of sight to watch the inmate-patient ambulate into the library and exit the library and did not notice anything wrong with Pendleton's stride to necessitate further diagnostics; she clarified she watches all inmates as

they walk in or out of the library as part of her evaluation.  She testified if she had been made aware of his foot injury, she would have taken different steps.

APN Finley testified she last treated Pendleton on December 4th for a hospital follow-up. She stated he was angry and uncooperative at the visit.  When told he had no other recourse, APN Finley testified she informed Pendleton of his ability to see any provider of his choice, but he would be required to pay the provider.  APN Finley stated she does not charge the inmate-patients for treating them.  When asked by the court, APN Finley testified she made every effort to listen to the inmate-patients, contending she did not treat Pendleton any differently than the other inmate-patients nor did she ignore his complaints or symptoms.

## III.   Discussion:

"The Eighth Amendment prohibits the infliction of cruel and unusual punishment.  The treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment."  *Schaub v. VonWald*, 638 F.3d 905, 914 (8th Cir. 2011) (citing *Helling v. McKinny*, 509 U.S. 25, 31 (1993)).  To prevail on a claim of deprivation of medical care, an inmate must show that the prison official was deliberately indifferent to the inmate's serious medical needs.  *Id.* (citing *Coleman v. Rahija*, 114 F.3d 778 (8th Cir. 1997)).  This requires a two-part showing: (1) the inmate suffered from an objectively serious medical need; and (2) the prison official knew of the need, yet deliberately disregarded it.  *Id.*; *See also Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Estelle v. Gamble*, 429 U.S. 97, 105 (1976).  Whether an inmate's condition is a serious medical need and whether an official was deliberately indifferent to the inmate's serious medical need are both questions of fact.  *Coleman*, 114 F.3d at 785.

-14-

First, the objective component requires a serious medical need be established by the inmate-plaintiff.  A serious medical need is "one that has been diagnosed by a physician as requiring treatment, or one that is so obvious even a layperson would easily recognize the necessity for a doctor's attention." *VonWald*, 638 F.3d at 914 (citing *Camberos v. Branstad*, 73 F.3d 174, 176 (8th Cir. 1995)).  If the need is obvious to a layperson, there is no requirement to verify this by medical evidence.  *Id*. (citing *Hartsfield v. Colburn*, 371 F.3d 454, 457 (8th Cir. 2004)).  The determination that a medical need is objectively serious is a factual finding.  *See Coleman*, 114 F.3d at 784.  The determination of whether a medical need is sufficiently obvious cannot be analyzed in a vacuum and background knowledge of the inmate's medical condition or medical records is part of the analysis. *Jones v. Minnesota Dept. of Corrections*, 512 F.3d 478, 482 (8th Cir. 2008).

Second, the subjective component requires a plaintiff to show that the defendant actually knew of, but deliberately disregarded, such need.  *Grayson v. Ross*, 454 F.3d 802, 808-809 (8th Cir. 2006); *Moore v. Jackson*, 123 F.3d 1082, 1086 (8th Cir. 1997).  Prisoners alleging deliberate indifference must show more than negligence, even more than gross negligence, and must establish a "mental state akin to criminal recklessness: disregarding a known risk to the inmate's health." *Jolly v. Knudsen*, 205 F.3d 1094, 1096 (8th Cir. 2000); *Gordon v. Frank*, 454 F.3d 858, 862 (8th Cir. 2006.  "This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *McRaven v. Sanders*, 577 F.3d 974 at 979 (8th Cir. 2009) (citing *Gamble*, 429 U.S. at 104-105).  "The inmate must clear a substantial evidentiary threshold to show the prison's medical staff deliberately disregarded the inmate's needs by administering inadequate treatment." *Nelson v. Shuffman*, 603 F.3d 439, 448-449 (8th Cir. 2010).

The Supreme Court held prison officials may not be held liable if they prove that they were unaware of even an obvious risk or if they responded reasonably to a known risk, even if the harm ultimately was not averted. *Farmer*, 511 U.S. at 826. Deliberate indifference "must be measured by the official's knowledge at the time in question, not by 'hindsight's perfect vision.'" *VonWald*, 638 F.3d at 915 (quoting *Jackson v. Everett*, 140 F.3d 1149, 1152 (8th Cir. 1998)). The determination that prison officials had actual knowledge of a serious medical need may be inferred from circumstantial evidence or from the very fact that the risk was obvious. *See Farmer*, 511 U.S. at 842. However, "a prisoner's mere difference of opinions over matters of expert medical judgment or a course of medical treatment fail[s] to rise to the level fo a constitutional violation." *Taylor v. Bowers*, 966 F.2d 417, 421 (8th Cir. 1995) .

1. Serious Medical Need (Objective Component):

A serious medical need is "one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Coleman*, 114 F.3d at 784 (citing *Branstad*, 73 F.3d at 176). Yet, "[n]ot every ache and pair or medically recognized condition supports a claim of Eighth Amendment violation and the claim must involve a substantial risk of serious harm to the inmate." *Williams v. Arkansas Dept. of Correction*, 207 S.W.3d 519, 523-524 (2005) (citing *Roberson v. Goodman*, 293 F. Supp. 2d 1075 (2003). "To evaluate a claim for medical need, the civilized minimum of public concern for the health of prisoners is determined, striking a balance between objective need and cost." *Id*., citing *Ralston v. McGovern*, 167 F.3d 1160.

The Eighth Circuit affirmed the district court's finding that a "shoulder injury, having been treated by a doctor prior to his incarceration, constituted a serious medical need." *Branstad*, 73 F.3d

-16-

176.  Likewise, an inmate, who was diagnosed with epilepsy and hypertension and on a regimented, prescribed dosage schedule was found to have a serious medical need.  *Jolly v. Badgett*, 144 F.3d 573, 574 (8th Cir. 1998).  Conversely, the court concluded, an inmate diagnosed with only a wool allergy does not rise to the level of a serious medical need as it involves "only discomfort, rather than those situations that are potentially life threatening..."  *Williams*, 207 S.W.3d at 140.

Similar to the inmate in *Brandstad* and *Jolly*, Pendleton entered CCDC with a diagnosis of high blood pressure and a well-documented history of depression with recent suicidal attempts[5]. APN Finley was well-aware of Pendleton's depression and suicidal attempts, even making note on her first visit with him to request his treatment records from Vista Health.  *See* Def. Ex. 7.  She also noted Pendleton reported his depression was not well-controlled under his prior medication.  Def. Ex. 1.  Finally, APN Finley admitted to a cursory reading of Pendleton's RMFT forms which documented his depression's persistence despite the administration of medication.  Therefore, Pendleton has established that APN Finley had actual knowledge of diagnoses of hypertension and depression with suicidal tendencies.

Regarding Pendleton's November 9th fainting, APN Finley explicitly testified that she had no knowledge of this incident notwithstanding that the Plaintiff had clearly indicated that he fainted on his RFMT form. The only explanation for the Defendant's lack of knowledge is that she testified that she would only scan the RFMT form and that she relied primarily on what the patients would tell her when they came in to see her and that the Plaintiff never told her that he had fainted. The fact that the Plaintiff made no oral complaint of fainting is supported by Sgt. Ree who testified that  the

_____

[5] Pendleton had been treated at Vista Health for a suicide attempt in June 2009.  He entered CCDC in October 2009.  Def. Ex. 1.

-17-

absence of any reference to fainting in her notes indicates that Pendleton did not verbally inform APN Finley of his incident.  The court can infer knowledge of the risk only when circumstances suggest the defendant was reasonably exposed to the information about the obvious risk.  *Farmer*, 511 U.S. at 842-843.   While APN Finley was negligent in failing to read the RFMT form, which described Pendleton's November 9th fainting, her negligence does not make the risk any more obvious.  Therefore, Pendleton has failed to establish that APN Finley had actual knowledge of his November 9th fainting incident.

      2.  <u>Deliberate Indifference to Serious Medical Need (Subjective Component)</u>:

To prevail in establishing deliberate disregard, an inmate must establish not only the defendant's awareness of his serious medical need, but that she also disregarded the known risk, evidenced by acts or omissions of treatment that are sufficiently harmful to the inmate; this is a  fact intensive inquiry.  *Coleman*, 114 F.3d at 784.  The subjective medical evidence presented must show the "course of treatment, or lack of thereof, so deviated from professional standards" that the action taken was not reasonable.  *Smith v. Jenkins*, 919F.2d 90, 93 (8th Cir. 1990).  A prisoner alleging a delay in treatment must present verifying medical evidence that the prison officials "ignored an acute or escalating situation or that the [these] delays adversely affected his prognosis."  *Hirner*, 663 F.3d at 342.

In *Shuffman*, the Eighth Circuit held a delay in psychological treatment after an inmate's brutal rape by fellow inmate constituted deliberate indifference when the treating psychologist failed to initiate her own prescribed treatment for over fifty days.  *Shuffman*, 603 F.3d at 448-449.  Likewise, the court  found a note from the inmate-patient's doctor explaining the inmate-patient's needs for a padded toilet seat, handicapped accessible shower, mechanism for elevating his legs in

bed, and pressure-relieving mattress were "sufficient to find [the prison official] was aware of [the inmate-patient]'s medical needs. *Id.* at 916. Conversely, the Eighth Circuit has held doctor prescribed increased dosages, even to the level of toxicity, without more does not constitute deliberate indifference. *Knudsen*, 205 F.3d 1094 at 1096. The court stated the record, void of anything but the inmate's "unsupported speculation," does not support a finding that the medical care was 'so inappropriate as to evidence intentional maltreatment.'" *Id.* (citing *Smith v. Jenkins*, 919 F.2d 90, 93 (8th Cir. 1990)). Further, the Eighth Circuit has declined to impute subjective knowledge to a prison doctor when the evidence failed to show the physician had knowledge that a change in anti-seizure prescription presented a danger to the patient despite the fact the physician had the inmate's medical records which showed less medication had been administered previously. *Phillips v. Jasper County Jail*, 437 F.3d 791, 795 (8th Cir. 2006); *See also Jackson*, 140 F.3d at 1152 (knowledge is tested at the time in question not by "hindsight's perfect vision"). The court affirmed the district court's finding "[t]he fact that [the inmate-patient] disagreed with [the doctor] as to the proper anti-seizure drug and the need for a blood test does not establish deliberate indifference. 'The prisoner must show more than negligence, more than even gross negligence, and mere disagreement with the treatment decisions does not rise to the level of a constitutional violation.'" *Id.* (citing *Estate of Rosenberg v. Crandell*, 56 F.3d 35, 37 (8th Cir. 1995)).

In the present case, APN Finley's failure to change or completely stop Pendleton's medications does not rise to the level of constitutional violation; that is, APN Finley did not deliberately disregard Pendleton's serious medical need by omitting care or delaying treatment, but rather, she responded reasonably by quickly placing Pendleton on medication when she became aware of his medical need and then promptly ordering a psychiatric evaluation when it appeared his

medical needs were not best controlled by the present medications.  *Farmer*, 511 U.S. 826 (no liability for official if he was unaware of even an obvious risk or responded reasonably to a known risk, even if the harm was not averted).  In fact, on the same day she ordered the evaluation, APN Finley attempted to ensure Pendleton received "the best care" available.  Unlike the psychologist in *Shuffman*, APN Finley took steps to initiate immediate treatment.  First, APN Finley did not delay treatment to Pendleton as evidenced by the fact she ordered a psychological evaluation on November 13th - only four days after his first fall.  APN Finley testified she could have adjusted Pendleton's medication, but she felt his need was serious enough it warranted psychiatric care to ensure the proper dosage was given.  She also testified she believed SeroquelXR could not be abruptly stopped, relying on the manufacturer's packet insert.  *See Gamble* 429 U.S. at 106; *Bowers*, 966 F.2d at 421 (inmate's difference of opinion over treatment option selected does not constitute deliberate indifference); *Estate of Rosenberg*, 56 F.3d at 35.  Second, APN Finley testified she attempted to ensure Pendleton received the psychological evaluation, even so far as offering to contact Dr. Don Chambers on behalf of the jail administration; unfortunately for Pendleton, jail policy precluded APN Finley from following-through on her offer, and APN Finley testified she has no way of knowing if or when the jail will follow-up on her orders.  Third, when APN Finley saw Plaintiff on November 13th, Pendleton had only suffered one fainting incident, therefore, her deliberate indifference is measured at that time and not in hindsight.  *Jackson*, 140 F.3d at 1152.  The fact that APN Finley testified she could have consulted with Dr. Edwards,  could have ordered more testing, or could have changed Pendleton's medication, coupled with her professional decision to not employ these treatment options in lieu of a psychiatric evaluation, fails to rise to criminal recklessness.  *Long v. Nix*, 86 F.3d 761, 765 (8th Cir. 1996) (prison medical providers are not prevented from exercising

their independent professional judgment); *Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir. 1997) (existence of possible alternative course of treatment is not sufficient to raise inference of deliberate indifference when the prison official acted reasonably even if the harm was not ultimately avoided) (citing *Farmer*, 511 U.S. at 844)); *Knudsen*, 205 F.3d at 1096.  Fourth, the fact that Dr. Alemparte ordered the cessation of SeroquelXR is not imputed to APN Finley as criminal recklessness, as at the time of his treatment, Dr. Alemparte was aware of two fainting incidents as opposed to APN Finley's knowledge of only one.  *Gamble*, 429 U.S. at 106 (mere negligence or medical malpractice are not constitutional violations)*; Jackson*, 140 F.3d at 1152; *Jenkins*, 919 F.2d at 93 ("unsupported speculation" of different treatment option available does not make the medical care given "so inappropriate as to evidence intentional maltreatment."); *See also Crowley v. Hedgepeth*, 109 F.3d 500, 502 (8thCir. 1997) (no medical evidence to indicate adverse affect on prognosis)).  Finally, Pendleton has failed to establish how a delay in treatment adversely affected his prognosis.  Pendleton was held for overnight observation following his 11/28 fall and was then released to the jail without any need for medical intervention or follow-up at the hospital.  Pl. Ex. 9 at 2.  Further, his own testimony is that he is healthier now than when he entered jail, achieving weight loss and a normal blood pressure through a change in diet and increased exercise.  As such, there is no evidence that the fifteen days between treatment by APN Finley and at Summit, presented an adversity to his prognosis.  *Hirner*, 663 F.3d at 342.

In summary, Pendleton has established that APN Finley had notice of his hypertension and depression with suicidal ideation diagnoses.  However, Pendleton has  failed to establish notice of his November 9th fainting incident.  Further, he has failed to show how the treatment she provided, the medication she promptly prescribed and the psychiatric evaluation she subsequently ordered,

constituted deliberate indifference to his serious medical needs.

**IV.**   <u>**Conclusion**</u>:

     For the reasons stated above, judgment will be entered in favor of the Defendant.  Plaintiff's case is dismissed with prejudice.

     **DATED this 30th day of July 2012.**

                         /S/ *J. Marschewski*
                         HON. JAMES R. MARSCHEWSKI
                         CHIEF UNITED STATES MAGISTRATE JUDGE